

I N  T H E

# Court of Appeals of Indiana

Christain Z. Wall,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

FILED

Jul 10 2026, 9:01 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

July 10, 2026

Court of Appeals Case No.
25A-CR-1767

Appeal from the Elkhart Circuit Court

The Honorable Michael A. Christofeno, Judge

Trial Court Cause No.
20C01-2312-MR-000006

**Opinion by Judge Felix**
Judges May and Mathias concur.

**Felix, Judge.**

## Statement of the Case

Christain Wall murdered Jalen Young and Michael Pike during a parking lot brawl. A jury found Wall guilty of two counts of murder, and he admitted to using a firearm while committing both murders. The trial court sentenced Wall to 144 years of incarceration. Wall now appeals and raises four issues for our review:

1. Whether the State presented sufficient evidence to rebut Wall's claim of self-defense;
2. Whether the lack of a voluntary manslaughter instruction constituted fundamental error;
3. Whether Indiana Code section 35-50-2-11(i) prohibited the trial court from sentencing Wall on both firearm enhancements; and
4. Whether Wall's sentence is inappropriate under Indiana Appellate Rule 7(B).

We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

On December 13, 2023, Wall, his girlfriend, her aunt, and her aunt's boyfriend Danny Purdon all ate dinner together. After dinner, Purdon took Wall to a "bar to shoot pool" in Elkhart, Indiana. Tr. Vol. II at 154. Wall and Purdon started their night at The Galley and left to go to another bar a "[c]ouple hours" later, *id.* at 161. Wall was kicked out of the second bar, so he and Purdon returned to The Galley. While at The Galley the second time, Wall was "[b]ickering" with other patrons about playing pool. *Id.* at 221. Wall also

urinated or spilled a drink on himself, so some patrons "were . . . saying, 'Get him out of here, he's too drunk.'" *Id.* at 190. Young and Pike were not involved in any of these events. Wall was eventually kicked out of The Galley; Purdon stayed behind to "finish[ his] drink and pa[y] the bar tab." *Id.* at 177.

[4] At approximately 12:13 a.m. on December 14, Wall was outside The Galley, stumbling through the parking lot on the way to Purdon's SUV. There was about one parking space separating the passenger side of Purdon's SUV from the driver's side of Rashaun Smith's sedan. Wall waited near the front passenger side of Purdon's SUV.

[5] At approximately 12:17 a.m., Young left The Galley with Smith and Aubrey Naylor; Purdon left at about the same time. As Young went to get into Smith's sedan, Wall "called [Young] over." Tr. Vol. III at 52. After a brief verbal exchange, Wall "swung" at Young, Tr. Vol. III at 52, and a physical fight ensued. In less than 20 seconds, Young had "knock[ed Wall] down" and proceeded to "g[e]t on top of" Wall and hit him, *id.* at 123. Purdon "tried to interfere," but Smith prevented him from doing so by placing Purdon in a "chokehold." *Id.*

[6] In the meantime, Pike and a friend left The Galley, approached the fight just as it appeared to be settling down, and helped finish breaking it up. Wall got back on his feet. Young, Smith, and Naylor got into Smith's sedan, and Smith started backing out of their parking space. As they did so, Purdon knocked on the sedan's driver's window, asking, "Hey, are you okay? Hey, is everything all

right?" Tr. Vol. III at 126. Young then said, "F[*]ck this," and got out of the sedan's backseat. *Id.* Purdon immediately approached Young, and Smith parked his vehicle so he and Naylor could check on Young.

[7] While Purdon was reigniting the scuffle, Wall retrieved a handgun from the front passenger side of Purdon's SUV. Once Wall obtained a handgun, he walked to where the fight was continuing, he "made direct eye contact with" Naylor and told her, "I'm about to kill this n[*****]." Tr. Vol. III at 54. Wall then walked up to Young—who was not participating in the fight—and from just more than an arm's length away, Wall shot Young in the head. Young immediately dropped to the ground. Smith, Naylor, and two bystanders fled in the bystanders' vehicle.

[8] Pike, who had not been involved in any of the fighting, "ran up and tried to get the gun from" Wall, but Wall "pistol-whipped" him several times, causing Pike to fall to the ground. Tr. Vol. III at 190. Wall "stumbl[ed] again" and "fiddl[ed] with the gun," "aiming it around, like he[ was] looking for somebody else." *Id.* Pike "stood up," *id.*, but "was very disoriented," *id.* at 192. A bystander yelled for Pike to "run." *Id.* at 190–91. Pike "looked over" at the bystander, and from less than four feet away, Wall "shot [Pike] in the head." *Id.* at 190. Approximately three minutes elapsed from when Wall first swung at Young to when he shot Pike.

[9] Right after Wall shot Pike, all remaining bystanders left the scene. Wall, for an unknown reason, did not get into Purdon's SUV but instead entered the open

front passenger side of Smith's sedan and remained there until law enforcement arrived less than two minutes later. The first officer on scene repeatedly told Wall to put his "hands up," State's Ex. 129 at 09:19–10:00, so the officer could "help the people next to" Wall, *id.* at 09:58–10:00. Wall was "not really compliant" with the officer's instructions, *id.* at 09:53–09:56—"he would start to comply, and he would slowly look at [the officer] or look away; and then he would put his hands down, like a divided attention thing," Tr. Vol. IV at 52. Officers were able to safely detain Wall, who had blood on his hands, and later found his handgun underneath the front passenger seat of Smith's sedan.

[10] Both Young and Pike died from the single gunshot wounds Wall inflicted. Young was still conscious when the first officer arrived, but he died after being taken to an ambulance; Pike died within approximately two minutes of the first officer arriving on scene.

[11] Wall was taken to a local hospital because officers suspected he was intoxicated. While at the hospital, Wall told investigators that he "was walking to [his] car and a guy just started shooting at" him because "the guy [did not] know how to take his f[*]cking L in pool." State's Ex. 302 - Hospital Interview at 01:22–33;[1] *see also id.* at 08:13–38, 10:08–10:50. Wall stated he did not

---

[1] State's Exhibit 302 contains two video files: (1) "Christain Wall @EGH 12-14-2023," which is a video of law enforcement's interview with Wall at the hospital, and (2) "Christain Wall 12-14-2023," which is a video of law enforcement's interview with Wall at the Elkhart County Homicide Unit's office. For clarity, we refer to the first file as "State's Ex. 302 - Hospital Interview" and the second as "State's Ex. 302 - Office Interview."

"remember anything" other than "the f[*]cking gunshots going off and . . . looking down like, 'Oh, f[*]ck, like I'm f[*]cking bleeding.'" *Id.* at 13:50–14:08. One of the investigators asked Wall if he "ha[d] a gun tonight," and Wall answered, "No." *Id.* at 15:23–15:26. In a subsequent interview, Wall again denied possessing a gun at the time of the shootings, claimed someone else was the shooter, and denied having any knowledge of what led to the shootings or the immediate aftermath. Wall told the detective that he did not engage in a physical fight. When asked if he had told an officer he acted in self-defense, Wall "looked at [the detective] like [she] was an idiot for asking him" that question, telling her, "[N]o, there would be no reason why." Tr. Vol. IV at 192; *see also* State's Ex. 302 - Office Interview at 1:01:02–1:01:43. The detective told Wall she had watched surveillance video of the entire incident and described what she had seen; afterward, she asked Wall what he would say if their roles were reversed, and Wall responded, "I probably would say, your best chance is just looking at self-defense," *id.* at 1:49:47–1:49:58; *see also id.* at 2:03:10–2:03:21. Wall eventually admitted the handgun was his. At no point during these two interviews did Wall ever claim he acted in self-defense.

[12] The State charged Wall with two counts of murder[2] and alleged he used a firearm in committing these offenses[3]. At trial, Wall argued that he acted in self-defense. The jury found Wall guilty as charged, thereby rejecting his self-

---

[2] Ind. Code § 35-42-1-1(1).

[3] I.C. § 35-50-2-11(b)(1), (d).

defense claim.  Wall admitted to using a firearm in committing both murders. The trial court sentenced Wall to 144 years executed at the Indiana Department of Correction ("DOC").  This appeal ensued.

## Discussion and Decision

### 1. The State Presented Sufficient Evidence to Rebut Wall's Claim of Self-Defense

[13]  Wall challenges the sufficiency of the evidence rebutting his claim of self-defense.  When a defendant challenges the sufficiency of the State's evidence rebutting the defendant's self-defense claim, "the standard of review remains the same as for any sufficiency of the evidence claim."  *Turner v. State*, 253 N.E.3d 526, 533 (Ind. 2025) (quoting *Miller v. State*, 720 N.E.2d 696, 699 (Ind. 1999)).

> "A conviction is supported by sufficient evidence if 'there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'"  *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024) (quoting *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015)).  This Court reviews only the evidence most favorable to the verdict and the reasonable inferences therefrom, and will reverse only where it is shown that "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt."  *Teising* [*v. State*], 226 N.E.3d [780,] 783 [(Ind. 2024)].

*Konkle v. State*, 253 N.E.3d 1068, 1090–91 (Ind. 2025).  We do not reweigh the evidence or reassess witness credibility.  *Id.* at 1090 (quoting *Teising*, 226 N.E.3d at 783).

[14] "Self-defense is a legal justification for what would otherwise be criminal conduct," *Turner*, 253 N.E.3d at 534 (citing *Larkin v. State*, 173 N.E.3d 662, 670 (Ind. 2021)), and is "a complete bar to conviction," *id.* (citing *Hill v. State*, 497 N.E.2d 1061, 1064 (Ind. 1986)). "Once the defendant invokes self-defense, the State has the burden to disprove beyond a reasonable doubt at least one element of the justification." *Id.* (citing *Hill*, 497 N.E.2d at 1064).

[15] Indiana's self-defense statute provides that a "person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." Ind. Code § 35-41-3-2(c). If a person "reasonably believes that [deadly] force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony," then the person "is justified in using deadly force" and "does not have a duty to retreat." *Id.* Importantly, to assert self-defense, the person must have been "in a place where he had a right to be" and must have "acted without fault." *Turner*, 253 N.E.3d at 541 (quoting *Larkin*, 173 N.E.3d at 670). "A person who provokes, instigates, or participates willingly in the violence does not act without fault for the purposes of self-defense." *Id.* (quoting *Richardson v. State*, 79 N.E.3d 958, 964 (Ind. Ct. App. 2017)).

[16] Wall contends that the State did not present sufficient evidence to rebut his claim that he acted without fault and reasonably feared or apprehended death or great bodily injury. Assuming arguendo that Wall demonstrated all three

elements to claim self-defense, he has not established that the State failed to present sufficient evidence to rebut at least one of those elements.

[17] Wall's arguments on appeal are essentially requests for us to reweigh the evidence and reassess witness credibility, which we cannot do. *See Konkle*, 253 N.E.3d at 1090 (quoting *Teising*, 226 N.E.3d at 783). For instance, Wall argues that he "did not provoke or instigate the violence that immediately preceded the shootings," Appellant's Br. at 17, but was instead "react[ing] to a renewed and escalating confrontation," *id.* at 19. In pursuing this argument, Wall completely fails to acknowledge Naylor's testimony about Wall swinging at Young when starting the first scuffle, and Wall saying, "I'm about to kill this n[*****]" during the second scuffle and just prior to shooting Young, Tr. Vol. III at 54. Considering only the probative evidence and reasonable inferences supporting the verdict, Wall did not act without fault. *See Turner*, 253 N.E.3d at 541. Wall is the one who approached Young and threw the first punch, thereby instigating all the violence thereafter. On the facts of this case, Wall cannot rely on Purdon continuing the fight to negate Wall's own provocation of the entire violent incident, especially when Wall was already retrieving his handgun before the fight fully reignited, State's Ex. 2 - Event20231214001622037 at 04:10–04:30. Based on the foregoing, we cannot say the State failed to present sufficient evidence to rebut Wall's claim of self-defense.

## 2. The Trial Court Did Not Commit Fundamental Error in Instructing the Jury

[18] Wall contends that the trial court committed fundamental error in instructing the jury. In requesting we review for fundamental error, Wall acknowledges that this issue is waived because he did not object or request a voluntary manslaughter instruction. *See Dunn v. State*, 230 N.E.3d 910, 914 (Ind. 2024) (quoting *Miller v. State*, 188 N.E.3d 871, 874 (Ind. 2022)) (failing to object results in waiver); *Baker v. State*, 948 N.E.2d 1169, 1178 (Ind. 2011) (failing to tender a jury instruction results in waiver). We may review a waived claim of instructional error under the "narrow exception" of fundamental error. *Dunn*, 230 N.E.3d at 914 (quoting *Miller*, 188 N.E.3d at 874).

[19] An error is fundamental if it (1) "made a fair trial impossible" or (2) "constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." *Carr v. State*, 274 N.E.3d 444, 460 (Ind. 2026) (quoting *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018)). If a trial court "could recognize a viable reason why an effective attorney might not object" or tender an instruction, "the error is not blatant enough to constitute fundamental error." *Durden*, 99 N.E.3d at 652 (quoting *Brewington v. State*, 7 N.E.3d 946, 974 (Ind. 2014)).

[20] Wall's justification for the shooting was that he acted in self-defense when he shot Young and Pike. "A voluntary manslaughter instruction would likely have conflicted with this theory of the case." *Morgan v. State*, 755 N.E.2d 1070, 1076 (Ind. 2001). Voluntary manslaughter is murder that is "mitigat[ed]" by

"[t]he existence of sudden heat." I.C. § 35-42-1-3(b). "Sudden heat exists when a defendant is 'provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection.'" *Carmack v. State*, 200 N.E.3d 452, 459–60 (Ind. 2023) (quoting *Brantley v. State*, 91 N.E.3d 566, 572 (Ind. 2018)). Wall's defense was that he acted in self-defense, which necessarily meant that he acted without fault, *see Turner*, 253 N.E.3d at 541 (quoting *Larkin*, 173 N.E.3d at 670). Here, the trial court could have recognized a viable reason why Wall's attorney did not seek a voluntary manslaughter instruction—such an instruction would have been inconsistent with Wall's self-defense claim. Therefore, any error in not instructing the jury as to voluntary manslaughter was not so blatant as to constitute fundamental error.

### 3. Indiana Code Section 35-50-2-11(i) Prohibited the Trial Court from Sentencing Wall on Both Firearm Enhancements

[21] Wall next claims the trial court improperly applied Indiana Code section 35-50-2-11 to enhance both of his murder sentences. We generally review a trial court's sentencing decision for an abuse of discretion. *Owen v. State*, 210 N.E.3d 256, 269 (Ind. 2023) (quoting *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *as amended* (July 10, 2007), *decision clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007)). "An abuse of discretion occurs if the decision is 'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id.*

(quoting *Anglemyer*, 868 N.E.2d at 490). However, to the extent Wall's claim raises questions of statutory interpretation, our review is de novo. *Waggoner v. Anonymous Health Sys., Inc.*, 274 N.E.3d 1245, 1249 (Ind. 2026) (citing *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016)).

[22] Indiana Code section 35-50-2-11 provides two frameworks under which a defendant's sentence may be enhanced for use of a firearm. First, pursuant to Subsection (g), a defendant's sentence will be enhanced if the State proves "beyond a reasonable doubt that the [defendant] knowingly or intentionally used a firearm in the commission of [an] offense," as that term is defined in Subsection (b). I.C. § 35-50-2-11(g); *see also id.* § 35-50-2-11(d). An "offense" includes a felony under Indiana Code article 35-42 that resulted in death or serious bodily injury. *Id.* § 35-50-2-11(b)(1). Second, pursuant to Subsection (h), a defendant's sentence will be enhanced if the State proves "beyond a reasonable doubt that the [defendant], while committing a felony or misdemeanor . . . , knowingly or intentionally . . . pointed a firearm; or . . . discharged a firearm . . . at an individual whom the [defendant] knew, or reasonably should have known, was a police officer." *Id.* § 35-50-2-11(h); *see also id.* § 35-50-2-11(e). Importantly, pursuant to Subsection (i), a defendant "may not be sentenced under [S]ubsections (g) and (h) for offenses, felonies, and misdemeanors comprising a single episode of criminal conduct." *Id.* § 35-50-2-11(i).

[23] Wall argues that Subsection (i) applies when a defendant is sentenced for (1) at least two enhancements under Subsection (g), (2) at least two enhancements

under Subsection (h), and (3) at least one enhancement under Subsection (g) and at least one enhancement under Subsection (h). The State argues that Subsection (i) applies only to the third situation.

[24] By its plain language, "[S]ubsection (i) prohibits a trial court from imposing a sentence enhancement on more than one conviction where a defendant is convicted of multiple offenses comprising a single episode of criminal conduct, even if more than one of the offenses would otherwise be eligible for a sentencing enhancement." *Howell v. State*, 97 N.E.3d 253, 267 (Ind. Ct. App. 2018), *trans. denied*; *see also Jarrett v. State*, 160 N.E.3d 526, 538–39 (Ind. Ct. App. 2020), *trans. denied*. Regardless of how many firearm enhancements are proven and under what subsections they are brought, if the offenses to which those enhancements apply comprise a single episode of criminal conduct, then Subsection (i) allows for only one of those offenses to be subject to the sentencing enhancements in Subsections (g) and (h). *See Howell*, 97 N.E.3d at 267–68. Accordingly, Subsection (i) applies when a defendant may be sentenced (1) at least twice under Subsection (g), (2) at least twice under Subsection (h), or (3) at least once under Subsection (g) and at least once under Subsection (h).

[25] Because Wall was sentenced twice under Subsection (g), we must determine whether his murder convictions comprise a single episode of criminal conduct. *See* I.C. § 35-50-2-11(i). An "episode of criminal conduct" refers to "offenses or a connected series of offenses that are closely related in time, place, and circumstance." *Id.* § 35-50-1-2(b); *see Howell*, 97 N.E.3d at 268–69 (applying

I.C. § 35-50-1-2(b) to I.C. § 35-50-2-11(i)). "Whether certain offenses constitute a single episode of criminal conduct is a fact-intensive inquiry determined by the trial court." *Fix v. State*, 186 N.E.3d 1134, 1144 (Ind. 2022) (internal quotation marks omitted) (quoting *Schlichter v. State*, 779 N.E.2d 1155, 1157 (Ind. 2002)). "While the ability to recount each charge without referring to the other offers guidance on the question of whether a defendant's conduct constitutes an episode of criminal conduct, we focus our analysis on the timing of the offenses and the simultaneous and contemporaneous nature of the crimes, if any." *Id.* (internal quotation marks omitted) (quoting *Reed v. State*, 856 N.E.2d 1189, 1200 (Ind. 2006)).

[26]  In less than one minute, and within mere feet of each other, Wall shot both Young and Pike. Wall shot Young and then shot Pike as Pike attempted to disarm Wall. On the facts of this case, Wall's murders of Young and Pike are so closely related in time, place, and circumstance that they comprise a single episode of criminal conduct. Accordingly, Wall could not be sentenced twice under Subsection (g), and one of his two firearm enhancement sentences must be reversed. We reverse Wall's firearm enhancement sentence for his murder of Pike.[4]

---

[4] Because there is essentially no difference here between reversing the 10-year firearm enhancement sentence for Young's murder and reversing the 10-year firearm enhancement sentence for Pike's murder, we have simply chosen to reverse the latter as the later-in-time event. Our choice should not be read as announcing a rule for determining which firearm enhancement sentence should be reversed when, as here, the imposition of more than one such sentence violates Indiana Code section 35-50-2-11(i).

### 4. Wall's Amended Sentence Is Not Inappropriate under Appellate Rule 7(B)

[27] Finally, Wall argues his sentence is inappropriate under Appellate Rule 7(B) and should be revised. The Indiana Constitution authorizes us to independently review and revise a trial court's sentencing decision. *Tillett v. State*, 278 N.E.3d 359, 366 (Ind. 2026) (citing Ind. Const. art. 7, §§ 4, 6). That authority is implemented through Appellate Rule 7(B), which permits us to revise a sentence if, "after due consideration of the trial court's decision," we conclude "that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Id.* (quoting Ind. Appellate Rule 7(B)).

[28] The defendant bears the burden of producing compelling evidence that "his or her sentence has met the inappropriateness standard of review." *Tillett*, 278 N.E.3d at 366 (alteration omitted) (quoting *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)). A defendant "need not 'necessarily *prove*'" that the sentence is inappropriate based on *both* the nature of his offense *and* his character, *Lane v. State*, 232 N.E.3d 119, 126 (Ind. 2024) (emphasis in original) (quoting *Connor v. State*, 58 N.E.3d 215, 219 (Ind. Ct. App. 2016)), but "to the extent the evidence on one prong militates against relief, a claim based on the other prong must be all the stronger to justify relief," *id.* at 127 (citing *Connor*, 58 N.E.3d at 220).

[29] Whether a sentence is inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Tillett*, 278 N.E.3d at 366 (quoting *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020)). "We generally

defer to the trial court's decision," *id.* (citing *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012)), but "we are not limited to the mitigators and aggravators found by the trial court," *Brown v. State*, 10 N.E.3d 1, 4 (Ind. 2014). We "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Lane*, 232 N.E.3d at 122 (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)). "Our role is to 'leaven the outliers,' which means we exercise our authority only in 'exceptional cases.'" *Tillett*, 278 N.E.3d at 366 (quoting *Russell v. State*, 234 N.E.3d 829, 856 (Ind.), *cert. denied*, 145 S. Ct. 424 (2024)).

[30] A trial judge may impose any sentence within the statutory range without regard to the existence of aggravating or mitigating factors. *Anglemyer*, 868 N.E.2d at 489. When considering the nature of the offense, we start with the advisory sentence. *Brown*, 10 N.E.3d at 4 (citing *Anglemyer*, 868 N.E.2d at 494). Here, Wall was convicted of and sentenced on two counts of murder. "A person who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with *the advisory sentence being fifty-five (55) years*." I.C. § 35-50-2-3(a) (emphasis added). On his two murder convictions, the trial court sentenced Wall to 62 years executed at the DOC. Because the trial court determined Wall had used a firearm in committing the murders, each murder conviction was to be enhanced by an additional fixed term between 5 years and 20 years, provided the two offenses did not comprise a single episode of criminal conduct. *See id.* § 35-50-2-11(g), (i). The trial court

enhanced each murder conviction sentence by 10 years, resulting in two 72-year sentences. However, because Indiana Code section 35-50-2-11(i) applies here to prohibit a second firearm enhancement sentence, *see supra* ¶ 26, Wall has one 72-year sentence and one 62-year sentence. The trial court ordered Wall to serve his murder sentences consecutively, so his total amended sentence is 134 years executed at the DOC. The maximum sentence Wall could have received was 150 years—65 years for each murder and 20 years for the firearm enhancement. Therefore, Wall's sentence is 16 years less than the maximum possible sentence.

[31] Where, as here, the trial court deviated from the advisory sentence, one factor we consider is "whether there is anything more or less egregious about the offense committed by the defendant that makes it different from the 'typical' offense accounted for by the legislature when it set the advisory sentence." *T.A.D.W. v. State*, 51 N.E.3d 1205, 1211 (Ind. Ct. App. 2016) (quoting *Holloway v. State,* 950 N.E.2d 803, 806–07 (Ind. Ct. App. 2011)), *as amended* (May 26, 2023). We also consider whether the offense was "accompanied by restraint, regard and lack of brutality." *Tillett*, 278 N.E.3d at 366 (quoting *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015)).

[32] After starting and losing a fist fight with Young, Wall shot Young in the head. When Pike tried to disarm Wall so he could not shoot anyone else, Wall pistol-whipped Pike and then shot him in the head, as well. Both Young and Pike languished for some time before ultimately dying from the single gunshot wounds Wall inflicted. Wall's murders of Young and Pike were egregious and

"totally senseless," Tr. Vol. V at 138, and Wall did not exhibit any modicum of restraint, regard, or lack of brutality in committing these killings.

[33] In considering the character of the offender, "we engage in a broad consideration of a defendant's qualities," *T.A.D.W.*, 51 N.E.3d at 1211 (citing *Aslinger v. State*, 2 N.E.3d 84, 95 (Ind. Ct. App. 2014), *clarified on other grounds on reh'g*), including whether the defendant has "substantial virtuous traits or persistent examples of good character," *Tillett*, 278 N.E.3d at 366 (quoting *Stephenson*, 29 N.E.3d at 122).

[34] Wall was 22 years old when he murdered Young and Pike. At 16 or 17 years old, Wall began using marijuana "frequently," and at 19 years old, he "began drinking alcohol on a regular basis." Appellant's App. Vol. II at 187. Wall had a blood alcohol content of 0.191 less than two hours after he murdered Young and Pike. Wall was convicted in North Carolina of three misdemeanors: providing fictitious information to an officer, possession of marijuana, and possession of stolen goods. Wall was on probation for the possession of stolen goods conviction when he murdered Young and Pike. For approximately one year prior to December 2023, Wall was unemployed.

[35] Less than six months before the offenses in this case, Wall witnessed the shooting death of one of his brothers. Yet this did not stop Wall from inflicting the same trauma he experienced on those who witnessed him shoot Young and Pike.

[36] Furthermore, although Wall remained at the scene after shooting Young and Pike, he did nothing to help them. And when the first law enforcement officer arrived, Wall did not comply with his instructions, which prevented the officer from rendering aid to Young and Pike until other officers arrived and were able to detain Wall. Wall also lied to investigators at the hospital about what happened, stating an unknown man was the shooter.

[37] Based on the egregious nature of Wall's offenses and his less-than-exemplary character, we cannot say that Wall has produced compelling evidence demonstrating that the nature of his offenses or his character renders his sentence inappropriate. *See Lane*, 232 N.E.3d 119.

## Conclusion

[38] In sum, the State presented sufficient evidence to rebut Wall's self-defense claim, the lack of a voluntary manslaughter instruction was not fundamental error, the trial court erred by sentencing Wall on both firearm enhancements, and Wall's amended sentence is not inappropriate under Appellate Rule 7(B). We therefore affirm Wall's convictions and amended sentence, reverse the firearm enhancement sentence on his conviction for murdering Pike, and remand for the trial court to enter an amended sentencing order in accordance with this opinion.

[39] Affirmed in part, reversed in part, and remanded.

May, J., and Mathias, J., concur.

ATTORNEY FOR APPELLANT

Lisa M. Johnson

Brownsburg, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Kelly Loy
Section Chief, Criminal Appeals
Indianapolis, Indiana